[No. A067258. First Dist., Div. Five. Apr. 3, 1995.]

LINDA BURNETT KIDWELL, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and CALIFORNIA
HIGHWAY PATROL, Respondents.

**COUNSEL**

Linda J. Brown for Petitioner.

Krimen, Klein, Da Silva, Daneri & Bloom and Don E. Clark for Respondents.

**OPINION**

**KING, J.**—In this case we are asked to determine whether an employee's injury, which occurred while she was practicing at home to pass one of the protocols in an annual physical fitness test given by her employer, is compensable under this state's workers' compensation laws. We conclude the employee's subjective belief, that as a condition of her employment, she was requried to practice for the test, is objectively reasonable. Thus, we annul the decision of the Workers' Compensation Appeals Board (Board).

## FACTS AND PROCEDURAL HISTORY

On March 28, 1993, petitioner employee Linda Burnett Kidwell (hereafter applicant), employed for over 10 years as a state traffic officer by respondent State of California, California Highway Patrol (CHP), suffered an ulnar collateral ligament rupture of her right thumb at home, off duty, while practicing the standing long jump, a required test protocol of the CHP's annually administered, mandatory physical performance program (PPP) fitness test. As a result of said injury, applicant required surgery and used 58 hours of sick leave. She filed a claim for workers' compensation benefits which was denied by the CHP on the grounds that applicant's injury did not arise out of and in the course of her employment. The matter proceeded to two days of hearing before the workers' compensation judge (WCJ) in Santa Rosa.

The pertinent facts are not in dispute. According to CHP policy, "[t]he objectives of the [PPP] are to measure the ability of uniformed employees to perform specified physically demanding activities which are required of State Traffic Officers; to promote their ability to perform such activities; to encourage them to maintain themselves in good physical condition; and to minimize on-the-job injuries and illnesses related to poor physical condition." The annual PPP fitness test was developed by a physiologist from the University of California at Davis. Applicant, hired by the CHP prior to January 1, 1984, was a "Tier 1" employee. As such, applicant was *required* to annually take the PPP fitness test.

The standing long jump was one of the PPP fitness test protocols. The purpose of the standing long jump is to test the muscular leg power (explosive) of each employee. The test is related to the "work task" of running the 100-yard dash in 20 seconds or less upon exiting from a car, and is scored as a "pass" with a minimum clearance of 68 inches.[1] In 1990, 1991 and 1992,

---

[1] The CHP policy manual outlines the test protocol, as follows: "The employee will stand with feet several inches apart and with toes in back of the take-off line. Shoes will be worn during this test. The employee shall jump forward, taking off from both feet and landing on both feet. Free swinging of the arms and bending of the knees is permissible. However, the feet must not leave the take-off surface until the jump is made. [¶] One additional trial will be allowed if the employee fails the initial attempt. The measurement is made from the take-off line to the heel or any part of the body that touches the surface nearest the take-off line. [¶] The distance jumped on the maximum jump shall be recorded in inches."

The manual further states that the purpose of the related work task of sprinting 100 yards is to determine the officer's ability to perform the physically demanding task requiring muscular power of the legs. The task protocol requires an officer to perform the sprint in full summer uniform with protective vest and baton in temperature not to exceed 85 degrees on a firm and level surface. The task begins with the officer behind the steering wheel in the

applicant failed the standing long jump portion of the PPP fitness test.[2] In June 1993, after returning to full duty following the right-hand injury, applicant again passed the annual PPP fitness test, except for the standing long jump, which she failed by only one inch.[3]

PPP fitness tests are considered "job related" but not "minimum job standards" for Tier 1 employees. Thus, failing the test did not affect applicant's employment security. However, CHP policy mandates that failure of the annual PPP fitness test by a Tier 1 officer results in a loss of "eligibility for PPP salary differential,[4] voluntary initial assignment to special duty, promotion, and voluntary special overtime programs." In addition to losing these administrative benefits, officers who fail the annual PPP fitness test are issued a "fitness plan" in accordance with CHP guidelines and can begin the "retest cycle"[5] as outlined in the CHP policy manual. Failure of the PPP fitness test also appears on an officer's performance evaluation.

On March 28, 1993, the date of injury, applicant had set up an area measuring 68 inches in her home on the carpet to practice the standing long jump. The third time she jumped, she fell forward and jammed her right thumb, pulling the ligaments away from the bone. Liability for applicant's injury was denied on the basis that she was engaged in an off-duty activity, i.e., practicing the standing long jump, that was not part of her preapproved fitness exercise plan pursuant to CHP policy. Injuries sustained while engaged in a current, preapproved fitness plan are considered job related, even if incurred while off duty.[6] The CHP policy manual provides that there "are two categories of exercise regimens from which to choose when developing

driver's seat of a patrol car with the seat belt fastened and the door closed. Upon the command to go, the officer then must remove the seat belt, open the door, get out of the car, and perform the sprint with baton in hand in 20 seconds or less. An officer who fails the standing long jump portion of the PPP fitness test twice in one year is to be offered the related work task. The record is not clear whether applicant either was offered or attempted the related work task when she failed the standing long jump. This, however, is not germane to the issues before this court on review.

[2]On April 16, 1990, applicant cleared a distance of 66 inches. The documentation of her 1991 test results were unavailable. Applicant testified without rebuttal that she believed she did not pass the standing long jump in 1991. On April 6, 1992, applicant cleared a distance of 64 inches.

[3]On June 3, 1993, applicant cleared a distance of 67 inches. On the test documentation for the overall PPP fitness test in 1993, it was noted that applicant had recently returned from limited duty, as well as the following: "Excellent job Linda!"

[4]Applicant's PPP salary differential was $130 per month.

[5]"Retests" for Tier 1 employees are optional and scheduled no more frequently than once every 90 days. They include only those portions of the annual PPP fitness test which the employee failed.

[6]Highway patrol manual (HPM) section 70.9 provides, as pertinent: "The purpose of providing an employee with a Fitness Plan is to ensure that an *exercise program* is made available which will assist the employee in passing the PPP tests. [¶] A Fitness Plan will be

Fitness Plans: aerobic exercises; and muscle strengthening and endurance exercises. An employee may include up to four aerobic exercises; one weight training and one calisthenics program in his/her Fitness Plan." Applicant had an approved fitness plan on file at the time of her injury. She had signed the appropriate document indicating that only injuries incurred as part of the approved fitness plan were covered under workers' compensation.

*The parties stipulated that the standing long jump was not part of applicant's fitness plan and could not be a part of an officer's fitness plan.* It was a test; it was not an exercise nor a recreational activity. Even had applicant desired to designate the standing long jump as part of her fitness plan, it would not have been permitted. It was unrebutted that the sole reason applicant was performing the standing long jump on March 28, 1993, was to practice for the upcoming PPP fitness test.[7] It also was unrebutted that no one at the CHP ever told applicant not to practice the standing long jump prior to her injury. In fact, several officers told her to practice and gave her tips on how to perform the jump. Specifically, Officer Verin, whom applicant believed to be her testing coordinator for 1991, showed her the proper technique of jumping and falling forward on her toes, rather than on her heels, in order to assist her in practicing. The CHP does not formally specify methods for learning the proper technique for the standing long jump.

Officer Paulson testified that he formerly had been a training officer for the PPP fitness test for several years. He regularly advised officers to practice for the standing long jump and recommended certain techniques. This included how to position the hands, how to squat, and how to land. He knew of no individual who could take the standing long jump test without some prior preparation. Officer Paulson was never told by anyone at the CHP that officers should not practice for the standing long jump. He was aware that the standing long jump could not be part of an officer's approved fitness plan.

Sergeant Dudley testified that he had worked for the CHP since 1971 and had failed the standing long jump portion of the annual PPP fitness test on

provided to any uniformed employee requesting one . . . . [¶] It is not the Department's intent to limit the off-duty athletic activities of employees. However, since the Department has accepted a degree of responsibility for injuries sustained while employees are exercising, reasonable limitations are essential. [¶] Off-duty *recreational* activities, whether done individually or as a member of a group or team, are done on a voluntary basis by employees and are not duty related. . . . [¶] *Only injuries sustained while engaged in a physical conditioning program outlined in an approved Fitness Plan, which is current and on file with the Department, are job related."* (Italics added.)

[7]Applicant also engaged regularly in exercises as part of her approved fitness plan to prepare for the standing long jump, as well as the overall PPP fitness test. These activities included stair stepping, stationary cycling, and weight training.

one occasion. His testing coordinator showed him how to practice, and he apparently passed the test on his next attempt. He helped applicant by showing her the techniques that aided him, specifically, swinging the arms so that one jumps out, not up.

Officer Gallagher testified that he had been employed by the CHP for 27 years. His supervisor had told him that when practicing the standing long jump at home, he should make sure he was on a soft surface. In June 1982 he was injured while practicing at his home. His injury was accepted by the CHP as industrial.

Lieutenant Talbott testified that in his opinion, as the 1993 statewide CHP coordinator for the PPP fitness test, one did not have to practice the standing long jump in order to attain the proper explosive leg power. Rather, one had to develop the leg muscles. An example of developed explosive leg power would be the type of jumping performed by a basketball player. Lieutenant Talbott did admit, however, that one could not learn the *technique* of the standing long jump without practice.

On May 26, 1994, the WCJ issued his decision, concluding that, under the circumstances, practicing the standing long jump at applicant's home while off duty was a reasonable expectancy of her employment. Thus, the injury sustained to her right hand was industrial.

CHP petitioned the Board for reconsideration, contending that the injury was not compensable because it occurred while applicant was off duty in her home voluntarily practicing an activity that was not part of her preapproved fitness plan.

Against the recommendation of the WCJ, the Board granted reconsideration and issued its opinion on August 15, 1994. Determining that applicant was participating in an off-duty "athletic activity" that was not part of her preapproved fitness plan and that the CHP "*specifically excluded* as job-related any activities not part of an individualized, approved fitness plan," the Board panel in a two-to-one decision rescinded the findings of the WCJ. Conceding that applicant subjectively believed that practicing the standing long jump was expected by the CHP, the Board then concluded that her belief, when viewed objectively, was not reasonable under this appellate district's opinion in *Ezzy* v. *Workers' Comp. Appeals Bd.* (1983) 146 Cal.App.3d 252 [194 Cal.Rptr. 90] (hereafter *Ezzy*). Citing *Taylor* v. *Workers' Comp. Appeals Bd.* (1988) 199 Cal.App.3d 211 [244 Cal.Rptr. 643] (hereafter *Taylor*), also from this appellate district, the Board held that applicant did not sustain an injury arising out of and in the course of her employment. This petition for writ of review followed.

## DISCUSSION

Labor Code[8] section 3600, subdivision (a), provides in part: "Liability for the compensation provided by this division . . . shall, without regard to negligence, exist against an employer for any injury sustained by his or her employees arising out of and in the course of the employment . . . in those cases where the following conditions of compensation concur:

"' . . . . . . . . . . . . . . . . . . . . . . . . .

"(9)   Where the injury does not arise out of voluntary participation in any off-duty recreational, social, or athletic activity not constituting part of the employee's work-related duties, *except where these activities are a reasonable expectancy of, or are expressly or impliedly required by, the employment.*" (Italics added.)

In *Ezzy*, *supra*, 146 Cal.App.3d 252, this court construed "reasonable expectancy" of employment to require two elements: "(1) whether the employee subjectively believes his or her participation in an activity is expected by the employer, and (2) whether that belief is objectively reasonable. [¶] . . . The burden rests upon an employer to insure that no subtle or indirect pressure or coercion is applied to induce involuntary participation by an employee." (*Id.*, at p. 260.) The "reasonable expectancy" language in section 3600 was added in 1978 (Stats. 1978, ch. 1303, § 5, p. 4262) "to eliminate from the workers' compensation scheme *only* those injuries which were remotely work-connected. The use of such terms as 'reasonable expectancy' and 'impliedly required' in section 3600, . . . is evidence that the Legislature recognized the potential use by employers of indirect means to encourage participation in an activity, and that such indirect encouragement changes the voluntary character of such participation. The Legislature intended that injuries occurring under such circumstances should be considered work-connected, and must fall within the coverage of the workers' compensation scheme." (*Ezzy*, *supra*, 146 Cal.App.3d at p. 263.)

■   The second prong of the *Ezzy* test is at issue herein. Whether it is objectively reasonable that applicant believed she was obligated to practice the standing long jump during off-duty hours is a question of law. (*Ezzy*, *supra*, 146 Cal.App.3d at p. 259; accord, *Wilson* v. *Workers' Comp. Appeals Bd.* (1987) 196 Cal.App.3d 902, 904-905 [239 Cal.Rptr. 719] (hereafter *Wilson*); *Meyer* v. *Workers' Comp. Appeals Bd.* (1984) 157 Cal.App.3d 1036, 1042 [204 Cal.Rptr. 74].) On this record, we find compelling evidence that applicant unquestionably was under indirect or subtle employer pressure to

---

[8]All further statutory references are to the Labor Code unless otherwise noted.

pass the standing long jump. (*Ezzy*, *supra*, 146 Cal.App.3d at pp. 260, 263.) We conclude that her belief that she had to practice at home during her off-duty hours is objectively reasonable.

The Board's reliance on *Taylor*, *supra*, 199 Cal.App.3d 211, is carelessly misplaced. In *Taylor*, this court held that an off-duty knee injury sustained by a City of Berkeley (Berkeley) police officer during his lunch hour while he was playing basketball with other officers and civilians to stay in shape was not compensable. (*Id.*, at pp. 213, 216.) The officer maintained that, as a member of Berkeley's hostage negotiating team, he was expected by Berkeley to keep himself in good shape. The court, agreeing with the Board, found that although the officer may have subjectively believed he was expected to participate in the basketball game for the benefit of his employer, his belief was not objectively reasonable. (*Id.*, at p. 215.) The officer conceded that Berkeley did not require him to participate in the basketball game in order to stay in shape. He also knew it was not an approved activity by Berkeley for purposes of workers' compensation coverage. (*Ibid.*) Specifically, the officer was aware of a posted departmental order pertaining to personal injuries sustained by Berkeley's police officers. Berkeley had designated that compensable injuries would be limited to participation in required training programs and athletics requested in writing and " '. . . specifically approved in advance . . .' " by the chief of police.[9] *Taylor* concluded: "Where an employer expects employees to participate in recreational or athletic activities to maintain certain standards of physical fitness necessary for performance of their work, we think it reasonable to allow the employer to limit its liability for workers' compensation to injuries sustained in designated and preapproved athletic activities . . . . To hold otherwise would in effect render the employer potentially liable for any injury sustained in any recreational or athletic activity if the activity contributed to the employee's physical fitness." (*Id.*, at pp. 215-216.)

We find *Taylor* readily distinguishable from the case at bar. In *Taylor*, voluntary participation in an off-duty, lunchtime basketball game obviously was only remotely connected to the requirements of employment as a police officer. Moreover, Berkeley explicitly had limited its liability for injuries sustained in voluntary off-duty athletic activities. There was no pressure, indirect or otherwise, on Officer Taylor to play basketball to keep in shape. He knew he was using the Berkeley gym at his own risk and that any injury

---

[9]The order stated: " '. . . Mere use of Departmental facilities for athletics or exercise is not considered a basis for claiming a service-connected injury. Employees who use the Department gym and athletic equipment do so at their own risk. Workers' Compensation benefits shall not be awarded for any injury unless advance approval for the event has been authorized. . . .' " (*Taylor*, *supra*, 199 Cal.App.3d at p. 214.)

sustained would not be covered without advance authorization and approval. He did not have advance approval because Berkeley clearly intended not to cover officers' off-duty, lunchtime recreational basketball games.

In contrast, *Wilson, supra,* 196 Cal.App.3d 902, not discussed by the Board, is dispositive. In *Wilson,* the court addressed a City of Modesto (Modesto) police officer's injury that occurred as he was running while off duty to keep himself in physical condition to pass fitness tests *required* by Modesto to remain a member of the special emergency reaction team (SERT), a tactical unit of the police department. Annulling the Board finding of noncompensability, the Fifth Appellate District held that the officer established a reasonable basis for his subjective belief that physical conditioning was required by Modesto. (*Id.,* at pp. 908-909.) Both prongs of the *Ezzy* test were met. Officer Wilson believed he was to exercise during off-duty hours because his superior officers told him that off-duty conditioning would be necessary in order to maintain the SERT physical qualifications on a continuing basis. (*Id.,* at p. 906.)

In deciding whether Officer Wilson's subjective belief was objectively reasonable, the court did not find determinative the fact that the officer was neither compensated for his off-duty running and other physical conditioning, nor provided by Modesto with equipment, facilities, or supervision for his workouts. (*Wilson, supra,* 196 Cal.App.3d at p. 907.) Physical fitness indisputably was a requirement of all SERT members. All members were made aware that off-duty conditioning was necessary to pass the fitness tests required for membership. "It would be completely unrealistic to conclude that off-duty running was not expected of any member . . . who wanted to pass [Modesto's] test . . . ." (*Id.,* at p. 908.) Additionally, the court emphasized, while SERT membership was voluntary and failure to qualify for SERT was not detrimental to an officer's career, these facts did not detract from the benefit to Modesto as a factor supporting compensability under *Ezzy.* (*Ibid.*)

With these principles in mind, the facts in the instant case affirmatively support a finding that practicing for the standing long jump, which resulted in applicant's injury, was a reasonable expectancy of her employment. The Board's reasoning that applicant was not engaged in an activity reasonably expected of her employment at the time of her injury because she "was aware" that practicing the standing long jump was not part of her approved fitness plan is pure sophistry. It was conceded that even had applicant wanted to designate the standing long jump as part of her fitness plan, CHP policy prevented her from so doing. The standing long jump is not an exercise; it is one of the requisite protocols of the annual PPP fitness test.

Moreover, applicant was neither exercising nor working out at the time of her injury. Rather, she was *practicing* the standing long jump solely to better her technique in hopes that she would ultimately pass that portion of the annually required PPP fitness test. In contrast to *Taylor*, practicing the standing long jump was not a voluntary off-duty recreational activity akin to a lunchtime basketball game with one's peers. This record is replete with evidence that practicing the standing long jump was the only way to perfect the technique of jumping.[10] It is patently unreasonable to determine that the CHP did not expect applicant to practice. Additionally, it is unreasonable to assume that applicant should not have practiced in her home. There is no evidence in this record that the CHP offered its employees practice facilities, supervision or on-duty time to practice. Failure to pass the annual PPP fitness test resulted in loss of eligibility for PPP salary differential ($130 per month), voluntary initial assignment to special duty, promotion, and voluntary special overtime programs. Indisputably, this placed applicant under indirect employer influence and pressure to practice a test that she had failed for three previous years in a row. Unlike *Wilson* where no detrimental effects resulted from failure to qualify for Modesto's SERT program, here, failure to pass the annual PPP fitness test unquestionably was adverse to an officer's career.

Under these circumstances, we hold as a matter of law that applicant's belief that practicing the standing long jump was job related is objectively reasonable. That is, it was a reasonable expectancy of her employment under section 3600, subdivision (a)(9). (*Wilson, supra*, 196 Cal.App.3d at pp. 906, 909; *Ezzy, supra*, 146 Cal.App.3d at p. 260.) Accordingly, applicant's injury is compensable. The Board's decision is annulled, and the cause is remanded for proceedings consistent with the views expressed herein.

Peterson, P. J., and Haning, J., concurred.

---

[10]In fact, when she took the test in June 1993, applicant failed to pass the standing long jump only by one inch, bettering her 1990 and 1992 jumps by one and three inches respectively.